**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5025-13T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

BRIAN E. KILLION,

    Defendant-Appellant.

_____

Argued December 13, 2016 — Decided  April 26, 2017

Before Judges Reisner, Koblitz and Rothstadt.

On appeal from Superior Court of New Jersey,
Law Division, Atlantic County, Indictment No.
13-03-0720.

David A. Gies, Designated Counsel, argued the
cause for appellant (Joseph E. Krakora, Public
Defender, attorney; Mr. Gies, on the brief).

Sara M. Quigley, Deputy Attorney General,
argued the cause for respondent (Christopher
S. Porrino, Attorney General, attorney; Ms.
Quigley, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

A jury convicted defendant Brian E. Killion of thirty-four counts of an indictment charging him with sexually assaulting five children over a sixteen-year period. Twenty-eight counts survived merger. He was given an aggregate sentence of eighty-five years in prison. Seventy-five of those years are subject to the eighty-five percent parole disqualification provision of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Defendant appeals both the convictions and sentence. After reviewing the record in light of the contentions advanced on appeal, we reverse the convictions for counts twelve and twenty-seven and the sentencing under NERA on three counts, and remand for resentencing and a further hearing regarding counts seventeen and twenty-two. In all other respects we affirm.

I

The State called the five victims, two victims' mothers and several investigators to testify. Defendant did not testify.

"David"[1] testified that he met defendant, who was his assistant scoutmaster, at a Boy Scout meeting at the end of David's sixth-grade year, when he was approximately twelve years old. David went to weekly meetings and overnight camping trips where

---

[1] We use pseudonyms or initials for the victims and their mothers. R. 1:38-3(c)(12).

defendant was present.  David also spent time with defendant at defendant's home.

Defendant first performed oral sex on David when David was "about fourteen" in "the back bay marshes . . . around Absecon/Smithville area" in the spring of 1997.  After this encounter, before David was sixteen years old, defendant continued to engage David in oral sex and mutual masturbation at times at David's home in Atlantic County.

Defendant sometimes viewed David's semen under a microscope. Defendant also took pictures of David in defendant's bedroom; some of these photos included images of David measuring his own penis. David went on many trips with defendant, including a camping trip to Bass River where defendant masturbated David and performed oral sex on David when David was younger than sixteen.  David testified that it seemed he and defendant engaged in "some kind of sexual conduct every time [they] were alone together."  Defendant also unsuccessfully attempted to have anal sex with David.  David continued to have a relationship with defendant until he was twenty years old.  The State located David in a homeless shelter using photographs of David retrieved from defendant's bedroom.  David was twenty-nine years old at the time of the trial.

The second victim, "Wyatt," testified he was eleven years old when he met defendant through a string band that marched in the

Mummer's Parade. Wyatt started sleeping over at defendant's house shortly after meeting him. One of the first times Wyatt slept at defendant's house, Wyatt walked in on defendant watching pornography and masturbating. Defendant told Wyatt to take his pants down and proceeded to masturbate Wyatt. That same day, Wyatt witnessed defendant masturbate and ejaculate into a tissue. Later, Wyatt and defendant masturbated themselves while watching pornography.

When Wyatt was thirteen years old, defendant also used a sex toy, "Flip-a-Sista," in front of Wyatt, and offered it to Wyatt who also used it. Defendant also took photos of Wyatt while Wyatt was naked from the waist down. Wyatt testified that he was thirteen years old when defendant took these pictures. Defendant kept a chart of Wyatt to keep measurements of his body as he developed, including the growth of his penis. Defendant performed oral sex on Wyatt "a lot." Wyatt testified that this began when he was around twelve years old. When defendant performed oral sex on Wyatt, defendant also masturbated.

Defendant masturbated Wyatt and performed oral sex on Wyatt upstairs in Wyatt's home while Wyatt's mother was downstairs. Defendant took Wyatt's semen and put it under a microscope to determine if Wyatt had any sperm. Defendant and Wyatt built a

computer together, and defendant told Wyatt "now you can go home and watch videos at home, pornography videos at home."

Defendant took Wyatt on trips at defendant's expense, including a trip to Florida for a week to see NASA. Defendant also brought Wyatt to the dentist to be examined for braces, and took Wyatt "for an entry exam at a local high school by [defendant's] house." The last time Wyatt saw defendant was at a band practice when defendant told Wyatt he had a gift for him, but Wyatt did not take it because "if I had taken it I'd have been basically saying it's okay."

The third victim, "Joey," testified that defendant was a family friend who he knew for most of his life, but that he became friends with defendant when Joey was between the ages of seven and nine years old. Defendant was not Joey's scoutmaster, but he did show up at the end of scout day-camp to help "with any work that would have to be done and just talk after that." Joey and Wyatt went with defendant for more than a week to the Ice Harvest Festival in Pennsylvania when Joey was eleven or twelve years old. Defendant showed Joey pornography while at Ice Harvest and while camping at Belleplain State Park in Woodbine. One time while at Belleplain, Joey walked into the lean-to where they were staying and found defendant and another boy masturbating while they watched pornography. Joey said that he was twelve years old when this

incident occurred. Joey also testified that in 2007, when he was eleven years old, defendant tried to wake Joey by touching Joey's "genital region."

When defendant and Joey went on trips, defendant bought the food, paid for hotel rooms, and was generally in charge. Joey's mother told him to listen to defendant when they were together.

The fourth victim, "Noah," met defendant when Noah was nine years old. K.C., Noah's mother, testified that Noah met defendant through another friend, and that Noah and defendant were very close. K.C. was happy defendant was close with her son, because Noah's husband was not around to do things with Noah. Whenever defendant took Noah anywhere, defendant always paid for Noah.

Noah testified that after he met defendant, he saw defendant almost every weekend, and they watched pornographic movies "[n]early every time" Noah went to defendant's house. When they watched the pornography, defendant masturbated while naked. Defendant asked Noah if he wanted to join him, and initially Noah declined, but eventually Noah joined defendant and the two masturbated while they watched the videos.

Noah identified the sex toy, Flip-a-Sista, and a lubricant, "Feel the Zing," which defendant showed him how to use. When he was at defendant's house, defendant asked Noah to masturbate

defendant, which Noah refused to do.     Defendant also asked Noah if defendant could hold Noah's penis, but Noah refused.

Defendant took Noah several places for day and weekend trips. They went on one camping trip to Belleplain State Park with Joey, who was thirteen at the time.  The three of them masturbated together.

Noah's mother, K.C., testified that defendant, whom she called "Brian," was responsible for Noah when they went camping:

> Q: And did you consider Brian to be in charge of your son?
>
> A: Most definitely.  If you're taking my child out of my care, out of my custody, as an adult of 37 at the time, you're darn straight that you're responsible for my child.  Everything that happens with my child you're responsible for.
>
> Q: And [what] did you expect him to do . . . for your son?
>
> A: Take care of him, take care, make sure he ate, make sure he was fed, make sure he got bathed, make sure he went to bed on time.  He was a little boy at the time, you know, so I expected him to do all the things I would have done or my husband would have done if he had been home.

K.C. also testified about a weekend trip when defendant took Noah to Virginia:

> I made sure Brian was in charge.  I had written up consent that God forbid anything happened with my son, whether it was emergency, medical-wise or anything, I gave him more or less power-of-attorney for the

A-5025-13T2

weekend that they were there to take care of his needs basically, and that's what he did.

Q: Did you ever give Brian insurance cards?

A: I always - - he had a copy of [Noah's] insurance card, yes, he did.

The fifth victim to testify, "Ethan," met defendant through Noah when Ethan was eleven years old, and went camping many times with Noah and defendant. Ethan testified that during these camping trips defendant was in charge:

Q: When you went away on these camping trips, who was in charge?

A: Brian.

Q: Did you have to listen to what he said?

A: Yeah.

Q: Did he get you food?

A: Yes.

Ethan also spent many nights at defendant's house. Ethan testified that when he went to defendant's house, Noah and defendant would watch "sexual-type movies" based on "the sounds that came from the laptop."

Ethan's mother, B.O., testified about defendant's role when he was around her son:

Q: Okay. Having allowed your son to stay overnight with Brian on those two occasions, what was your thought as to Brian's role with those kids?

A: He was responsible, and, I mean, I trusted [Noah's mother, K.C.]. My son had slept over [Noah's] house, you know, on several occasions, more than several, actually, many times, and since [K.C.] trusted Brian, I trusted him with my son.

Q: Did you trust him to take care of [Ethan] in case of an emergency?

A: Yes, he's an adult.

Q: I'm sorry.

A: He's an adult; he was the one in charge.

Q: And did you trust him, I guess, based on that line of thinking to feed your son?

A: Yes.

Q: And to supervise him?

A: Yes.

Q: Did you expect that Brian would, when they went camping, did you expect Brian would stay with the boys the entire weekend?

A: Yes.

Q: When he stayed at his house in Absecon, did you expect him to be fed and clothed and supervised?

A: Yes.

The last camping trip that Noah, Ethan and defendant took was to Bass River in 2010. That Sunday morning, Ethan and defendant started shaking Noah to wake him up. Defendant decided to wake Noah by performing oral sex on him until Noah ejaculated. Ethan

testified that he witnessed defendant perform oral sex on Noah and then buried his face in his pillow "to try not to look at it."

When Noah and Ethan arrived home from this camping trip with defendant, Noah immediately told his mother, K.C., that defendant had molested him. She punched defendant. The boys later told K.C. that earlier that morning defendant placed his mouth on Noah's penis to wake him up, while Ethan was in the tent. K.C. alerted the police. Later that night, defendant called K.C. and told her, "whatever [Noah] told you that I did to him, it was true."

The police searched defendant's bedroom in his house pursuant to a warrant. A detective testified he found a lubricant, Feel the Zing, a sexual toy, Flip-A-Sista, a letter from a mother giving defendant permission to take her son out of state and a letter from defendant to Noah. The detective read the contents of defendant's letter to the jury. In the letter, defendant apologized for letting Noah down, wrote that he loved Noah and that he hoped Noah would forgive him.

The detective also found pictures of Wyatt, and a letter from Wyatt to defendant, in which Wyatt apologized for acting up and stated that he would try to do better. The police also took a flash drive, a computer, a laptop, floppy disks, a camera and CDs, from defendant's bedroom. A microscope was visible in a photograph of defendant's room. The police found images of nude boys and

girls, of a penis with a ruler measuring the penis's length and pornographic videos on a hard drive in defendant's home. Several of these videos involved young children performing sex acts. Some of the photographs depicted David, who, the detective testified, was "a member of the Boy Scouts at the time with the defendant Brian Killion."

A detective who works in the computer crimes unit of the Atlantic County Prosecutor's Office examined the digital evidence recovered from defendant's home, which he described as:

> 20 pictures of young boys, nude male video, it was labeled as a 15-year-old penis, unable to tell the age; pictures of pre-teen underwear, 125 pictures of young boys in underwear; pictures of adult male, 20 pictures of penises; pictures of nude children/child abuse images, there was 1188 pictures of nude children mostly male under the age of 16.

The detective showed the jury samples of many of these pictures and videos.

## II

Defendant was convicted of the following counts of the second superseding indictment, after merger: first-degree aggravated sexual assault of Noah in 2010, N.J.S.A. 2C:14-2(a) (count one); second-degree endangering the welfare of Noah in 2010, N.J.S.A. 2C:24-4 (count three); second-degree sexual assault of Ethan in 2010, N.J.S.A. 2C:14-2(b) (count four); second-degree endangering

the welfare of Ethan in 2010, N.J.S.A. 2C:24-4 (count five); second-degree sexual assault of Noah from 2009 to 2010, N.J.S.A. 2C:14-2(b) (count six); third-degree showing obscene material to Noah from 2009 to 2010, N.J.S.A. 2C:34-3(b)(2) (count seven); second-degree endangering the welfare of Noah from 2009 to 2010, N.J.S.A. 2C:14-2(b) (count eight); first-degree aggravated sexual assault of Wyatt from 2004 to 2006, N.J.S.A. 2C:14-2(a) (count nine); second-degree endangering the welfare of Wyatt from 2004 to October 2006, N.J.S.A. 2C:24-4 (count eleven); first-degree aggravated sexual assault of Wyatt from October 2006 to October 2008, N.J.S.A. 2C:14-2(a) (count twelve); second-degree endangering the welfare of Wyatt from October 2006 to October 2008, N.J.S.A. 2C:24-4 (count fourteen); first-degree aggravated sexual assault of Wyatt from 2004 to October 2006, N.J.S.A. 2C:14-2(a) (count fifteen); second-degree endangering the welfare of Wyatt from 2004 to October 2006, N.J.S.A. 2C:24-4(a) (count seventeen); third-degree showing obscene material to Wyatt, N.J.S.A. 2C:34-3(b)(2) (count twenty-one); second-degree endangering the welfare of Wyatt from 2004 to 2008, N.J.S.A. 2C:24-4(a) (count twenty-two); second-degree sexual assault of Joey from 2007 to 2008, N.J.S.A. 2C:14-2(b) (count twenty-three); second-degree endangering the welfare of Joey from 2007 to 2008, N.J.S.A. 2C:24-4(a) (count twenty-four); second-degree sexual assault of Joey

12

from 2007 to 2008, N.J.S.A. 2C:14-2(b) (count twenty-five); second-degree endangering the welfare of Joey from 2007 to 2008, N.J.S.A. 2C:24-4(a) (count twenty-six); third-degree aggravated criminal sexual contact of Joey in 2009, N.J.S.A. 2C:14-3(a) (count twenty-seven); third-degree showing obscene material to Joey from 2007 to 2009, N.J.S.A. 2C:34-3(b)(2) (count thirty); second-degree endangering the welfare of Joey from 2007 to 2009, N.J.S.A. 2C:24-4(a) (count thirty-one); first-degree aggravated sexual assault of David from 1997 to 1999, N.J.S.A. 2C:14-2(a) (count thirty-two); first-degree aggravated sexual assault of David from 1997 to 1999, N.J.S.A. 2C:14-2(a) (count thirty-three); first-degree aggravated sexual assault of David from 1997 to 1999, N.J.S.A. 2C:14-2(a) (count thirty-five); fourth-degree endangering the welfare of a child by possessing child pornography, N.J.S.A. 2C:24-4(b) (count thirty-seven); second-degree endangering the welfare of a child by manufacturing child pornography, N.J.S.A. 2C:24-4(b)(5)(A) (count thirty-eight); second-degree causing a child to engage in a sex act for photography, N.J.S.A. 2C:24-4(b)(3) (count thirty-nine).[2]

---

[2] In addition, the jury found defendant guilty of other counts that the court subsequently merged into these charges, including second-degree sexual assault of Wyatt (count thirteen), N.J.S.A. 2C:14-2(c)(4).

Defendant through counsel raises the following issues on appeal:

> POINT I: COUNT 4 OF THE INDICTMENT MUST BE DISMISSED AND THE GUILTY VERDICT PERTAINING THERETO VACATED WHERE THE STATE PRESENTED NO EVIDENCE TO SUPPORT A CHARGE THAT THE DEFENDANT COMMITTED AN ACT OF SEXUAL CONTACT WITH [ETHAN].
>
> POINT II: THE GUILTY VERDICTS PERTAINING TO COUNTS 12 AND 27 SHOULD BE REVERSED WHERE THE STATE DID NOT SHOW THAT THE DEFENDANT HAD SUPERVISORY POWER OVER [WYATT] OR [JOEY] BY VIRTUE OF HIS LEGAL, PROFESSIONAL OR OCCUPATIONAL STATUS.
>
> POINT III: THE GUILTY VERDICTS PERTAINING TO COUNTS 3, 5, 8, 11, 14, 17, 22, 24, 26 AND 31 SHOULD BE REVERSED NOT ONLY WHERE THE STATE FAILED TO MEET ITS BURDEN OF PROOF AS TO THE DEFENDANT'S ASSUMPTION OF RESPONSIBILITY FOR THE CARE OF [NOAH], [ETHAN], [WYATT] OR [JOEY], BUT DUE TO THE TRIAL COURT'S ERROR IN FAILING TO CHARGE A LESSER INCLUDED OFFENSE. (NOT RAISED BELOW)
>
> POINT IV: COUNTS 9, 10, 15 AND 16 MUST BE DISMISSED AND THE GUILTY VERDICTS PERTAINING THERETO VACATED BECAUSE THE STATE FAILED TO PROVIDE EXCULPATORY EVIDENCE TO THE GRAND JURY WITH RESPECT TO THE AGE OF [WYATT] AT THE TIME THE ALLEGED OFFENSES OCCURRED.
>
> POINT V: NOT ONLY DID THE TRIAL COURT FAIL TO PROPERLY INSTRUCT THE JURY ON THE STATE'S THEORY OF LIABILITY AS TO THE CRIMES FOR WHICH THE DEFENDANT WAS CHARGED REGARDING [DAVID], BUT THE STATE DID NOT SHOW BEYOND A REASONABLE DOUBT THAT THE DEFENDANT HAD SUPERVISORY AUTHORITY OVER [DAIVD] SIMPLY BECAUSE HE WAS AN ASSISTANT SCOUTMASTER.
>
> POINT VI: THE PROSECUTOR'S COMMENTS DURING SUMMATION TO WHICH THE DEFENDANT OBJECTED WERE

14                                                    A-5025-13T2

CLEARLY AND UNMISTAKABLY IMPROPER WHERE THE
THEME SHE CONVEYED TO THE JURY PORTRAYED THE
DEFENDANT AND HIS TRIAL ATTORNEY AS LIARS.

POINT VII: CONTRARY TO ITS EXPRESSED INTENTION
THAT, IN ORDER TO RECOGNIZE THERE CAN BE NO
FREE CRIMES, IT WOULD IMPOSE SEPARATE
CONSECUTIVE SENTENCES ON EACH OF THE MOST
SERIOUS CRIMES INVOLVING EACH VICTIM, THE
SENTENCING COURT DID OTHERWISE WITHOUT
EXPLANATION.

POINT VIII: UNDER THE PRE-AMENDMENT STATUTE,
THE APPLICATION OF NERA REQUIRED A JURY TO
DETERMINE WHETHER THE OFFENSE WAS A "VIOLENT
CRIME".

Defendant raises the following issues in his pro se
supplemental brief:

POINT I: WHERE JUDGE . . . , J.S.C. PERSONALLY
KNEW MR. KILLION AND FAILED TO RECUSE HIMSELF,
ALL ARREST AND SEARCH WARRANTS ISSUED BY SAID
JUDGE MUST BE DEEMED INVALID.[3]

POINT II: COUNTS 32, 33, 34, 35 AND 36 MUST
BE DISMISSED AND THE ASSOCIATED GUILTY
VERDICTS VACATED BECAUSE THE PLAINTIFF FAILED
TO PROVIDE EXCULPATORY EVIDENCE TO THE GRAND
JURY PERTAINING TO SUPERVISORY POWERS OVER
[DAVID] AT THE TIME THE ALLEGED OFFENSES
OCCURRED (NOT RAISED BELOW).

POINT III: THE ERRONEOUS JURY CHARGE IS NOT
LEGALLY ACCURATE, FACTUALLY SUPPORTABLE OR

---

[3] The trial judge conducted an investigation as to whether the judge who approved the search warrant knew at the time that defendant was connected to the Boy Scouts and found no evidence that the judge was aware of the connection. Based on this decision, and for the reasons expressed by the trial judge in his April 23, 2013 letter opinion quashing defendant's subpoena of the judge who issued the warrant, we reject the argument raised in defendant's pro se Point I.

SUPPORTED BY THE EVIDENCE, THUS CONSTITUTING
REVERSIBLE ERROR.

    A. LEGALLY VAGUE REASONABLE DOUBT
       INSTRUCTIONS.
    B. DIFFERING THEORIES OF LIABILITY FOR
       4, 5, AND 38.
    C. ERRONEOUSLY ADDING [DAVID] TO COUNT
       39.

POINT IV: WHERE THE PLAINTIFF FAILED TO PROVE
THAT ANY CONDUCT OR RESULT OCCURRED WITHIN THE
JURISDICTION OF THIS STATE, BASING THE VERDICT
ON INSUFFICIENT EVIDENCE VIOLATED MR.
KILLION'S DUE PROCESS AND FAIR TRIAL BY JURY
RIGHTS AFFORDED BY THE U.S. CONST. AMEND. V,
VI, AND XIV.

    A. LACK OF JURISDICTION WITH RESPECT TO
       [JOEY]
    B. LACK OF JURSIDICTION FOR MANUFACTURING
    C. LACK OF JURISDICTION FOR PUBLISHING

POINT V: WHERE K.C. WAS PRESENTED AS A FRESH
COMPLAINT WITNESS AND HER TESTIMONY WENT
BEYOND THE SCOPE OF FRESH COMPLAINT HEARSAY,
THUS BOLSTERING VICTIM TESTIMONY AND CLEARLY
CAPABLE OF PRODUCING AN UNJUST RESULT, MR.
KILLION WAS DENIED HIS DUE PROCESS AND FAIR
TRIAL BY JURY RIGHTS AFFORDED BY THE U.S.
CONST. AMEND V, VI, AND XIV AND N.J. CONST.
ART. I, PARA. 9 AND 10. (NOT RAISED BELOW)

Defendant through counsel raises the following issues in his

reply brief:

POINT I: SEXUAL CONTACT OF THE ACTOR WITH
HIMSELF OR WITH THE VICTIM IS NECESSARY TO
PROVE A VIOLATION OF N.J.S.A. 2C:14-2b.

POINT II: THE TRIAL COURT'S FAILURE TO EXPLAIN
THAT THE SEPARATE QUESTION ON THE VERDICT
SHEET WOULD DETERMINE THE DEFENDANT'S DEGREE
OF CULPABILITY UNDULY PREJUDICED THE
DEFENDANT'S RIGHT TO A FAIR TRIAL.

           A-5025-13T2

POINT III: CONTRARY TO THE STATE'S ARGUMENT, THE TRIAL COURT DID NOT CURE WHAT IT BELIEVED TO BE "VERY STRONG" LANGUAGE BY THE PROSECUTOR IN ORDER TO DISPARAGE THE DEFENDANT AND HIS TRIAL ATTORNEY.

POINT IV: THE DEFENDANT'S SENTENCE OF 11 CONSECUTIVE TERMS IS EXCESSIVE.

### III

In Point I, defendant first claims that count four, second-degree sexual assault of Ethan, violating N.J.S.A. 2C:14-2(b), should have been dismissed, because defendant did not have sexual contact with Ethan and Ethan did not witness defendant touch himself. The State argues that defendant may be convicted under N.J.S.A. 2C:14-2(b) because defendant performed a sexual act on Noah in view of Ethan, who was in the same tent at the time.

Our review of a trial court's interpretation of a statute is a question of law. See State v. Maurer, 438 N.J. Super. 402, 411 (App. Div. 2014). We review questions of law de novo and "owe no deference to the trial court's 'interpretation of the law and the legal consequences that flow from established facts.'" Ibid. (quoting State v. Bradley, 420 N.J. Super. 138, 141 (App. Div. 2011)).

N.J.S.A. 2C:14-2(b) states: "An actor is guilty of sexual assault if he commits an act of sexual contact with a victim who is less than 13 years old and the actor is at least four years

older than the victim." N.J.S.A. 2C:14-1(d) defines "sexual contact" as:

> an intentional touching by the victim or actor, either directly or through clothing, of the victim's or actor's intimate parts for the purpose of degrading or humiliating the victim or sexually arousing or sexually gratifying the actor. Sexual contact of the actor with himself must be in view of the victim whom the actor knows to be present.
>
> [(Emphasis added).]

Our Supreme Court has interpreted these statutes to cover three types of scenarios: a defendant touching himself, a defendant touching a victim and a victim touching a defendant. State v. Zeidell, 154 N.J. 417, 428 (1998). In Zeidell, the defendant masturbated on the boardwalk in view of two children under the age of thirteen. Id. at 419-21. The Court found that the statute prohibited this behavior, because the defendant was touching himself with the purpose of "sexually arousing or sexually gratifying" himself. Id. at 428, 435. The Court explained,

> When the controlling statutory provisions of the Code are read together, we find that a tender-years-sexual assault under N.J.S.A. 2C:14-2(b) contains three key elements. They are: (1) a victim who is less than thirteen years old, (2) a defendant-actor who is at least four years older than the victim, and (3) a sexual contact with a victim under the critical age. The sexual contact with a victim involves an intentional or purposeful touching of an intimate part. There are three types of intentional sexual touchings: the actor may touch himself or herself, the actor

18

> may touch the victim, or the victim may touch
> the actor. Each such intentional touching
> must be for at least one of four purposes:
> either degrading or humiliating the victim,
> or sexually arousing or sexually gratifying
> the defendant-actor. Finally, if the touching
> is by the actor of himself or herself, the
> sexual touching must be in view of the victim
> whom the actor knows to be present.
>
> [Id. at 428.]

In contrast, lewdness, N.J.S.A. 2C:14-4(b)(1), "is limited to exposing or displaying an actor's intimate parts rather than touching them. For example, a 'flasher' or 'streaker' may expose the genitals without touching them." Id. at 431.

The charge of N.J.S.A. 2C:14-2(b) arises out of the last interaction defendant had with Noah and Ethan while camping on the morning of June 27, 2010. Defendant performed oral sex on Noah, and thus defendant violated N.J.S.A. 2C:14-2(b) against Noah. The question is whether this activity also constituted a violation of the same statute against Ethan. There was no testimony that defendant touched himself, rather than Noah, in the presence of Ethan. In Zeidell, the Court described three types of touching that the statute covered, but did not include a defendant touching a child sexually in the presence of another child. Zeidell, supra, 154 N.J. at 428.

In deciding not to dismiss count four, the trial court explained: "The [d]efendant had sexual contact with a victim under

A-5025-13T2

the age of 13 in view of [another] victim under the age of 13." Defendant was sexually touching Noah when he performed oral sex on him. This sexual touching was "in the view of" Ethan, who testified he was in the tent and saw defendant perform oral sex on Noah. Because defendant "engage[d] in a sexual touching 'in the view of' an underage child," count four of the indictment should not be dismissed. Id. at 431. We agree with the trial court that although our Supreme Court did not consider this possible scenario when describing the ways a defendant could be guilty of a violation of the statute, the Legislature intended to punish this behavior as well. We are confident that the Legislature intended the statute to cover an incident such as this, where defendant knew he was in the presence of a second child when he performed oral sex on a child. Certainly, masturbating in front of a child, which is behavior clearly covered by the statute, is less opprobrious than performing a child-sexual assault in front of another child. Moreover, the latter offense poses an even greater risk of a "shocking and threatening" impact on the child-observer. Id. at 432.

IV

We now consider defendant's arguments, in Point II, III, and V, that the State failed to prove the statutorily-required relationship between defendant and the victims. We review these

issues under the same de novo standard as we applied to the interpretation of N.J.S.A. 2C:14-2(b) above. When analyzing whether sufficient evidence was presented of defendant's assumption of the childcare responsibility, or his supervisory power, the question is whether "a reasonable jury could find guilt of the charge beyond a reasonable doubt" viewing the State's evidence in the light most favorable to the State. State v. Reyes, 50 N.J. 454, 458-59 (1967).

In Point III, defendant argues that that the State failed to meet its burden to prove that defendant assumed the child-care responsibility required by N.J.S.A. 2C:24-4(a)(1) to sustain a conviction of second-degree endangering the welfare of Noah, Ethan, Wyatt and Joey. Similarly, in Points II and V defendant argues that the State failed to meet its burden of proof that defendant had supervisory power over Wyatt, Joey and David by virtue of his legal, professional or occupational status to sustain a conviction of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(b) or third-degree aggravated criminal sexual contact, N.J.S.A. 2C:14-3(a). Both first-degree aggravated sexual assault and third-degree aggravated criminal sexual contact require the defendant to have the same supervisory relationship with the victim.

The standard for second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1), requiring a caregiving relationship, and first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(2)(b), requiring a recognized supervisory relationship, differ — "N.J.S.A. 2C:24-4(a) focus[es] more on the dependence and trust the child places in the adult" while N.J.S.A. 2C:14-2(a)(2)(b) focuses "on the coercive aspects of the relationship defined as 'supervisory or disciplinary power.'" State v. McInerney, 428 N.J. Super. 432, 449 (App. Div. 2012). Many aspects of the nature of the relationship between the defendant and the child "overlap." Ibid. The factfinder should consider "factors such as disparity in ages or maturity; the importance of the activity the adult supervises to the child; and the extension of the supervisory relationship beyond 'guidance and advice' expected given the defendant's supervisory role." Ibid.

### A.

In Point III, defendant argues as plain error that the evidence does not support a conviction on counts three, five, eight, eleven, fourteen, seventeen, twenty-two, twenty-four, twenty-six and thirty-one because the State presented insufficient proof at trial that defendant had the necessary "legal duty for the care of" or had "assumed responsibility for the care of" the

victim, an element of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1).

When an issue was not raised in the trial court, we review for plain error. See State v. Murray, 338 N.J. Super. 80, 87 (2001) (citing State v. Timmendequas, 161 N.J. 515, 575 (1999), cert. denied, 534 U.S. 858, 122 S. Ct. 136, 151 L. Ed. 2d 89 (2001)), certif. denied, 169 N.J. 608 (2001). "Plain error is 'error possessing a clear capacity to bring about an unjust result and which substantially prejudiced the defendant's fundamental right to have the jury fairly evaluate the merits of his defense.'" Timmindequas, supra, 161 N.J. at 576-77 (quoting State v. Irving, 114 N.J. 427, 444 (1989)).

Our Supreme Court has explained that the assumption of responsibility covers more than just the parent-child relationship. See State v. Sumulikoski, 221 N.J. 93, 107-08 (2015). The Court explained that "the assumption of responsibility in question can be formal or informal; it can be based on custody situations and less-structured relations." Ibid. (citing State v. Galloway, 133 N.J. 631, 659 (1993)).

To be convicted, the defendant "must have established a continuing or regular supervisory or caretaker relationship with the child." Galloway, supra, 133 N.J. at 661. In Galloway, the Court determined that a defendant who dated his victim's mother

23                                                              A-5025-13T2

did not have the continuous caretaking or supervisory responsibilities necessary to be convicted under this statute. Id. at 662. The defendant dated the mother for only three months, and no evidence was presented about how often the defendant assumed the care of the child. Ibid.

Here, defendant had continuous relationships with his victims in which he regularly assumed responsibility. Noah testified that he saw defendant every weekend, often at defendant's home, and that he viewed defendant as a "father figure." During their relationship, defendant took Noah to the Franklin Institute in Philadelphia several times, Washington, D.C. for a weekend trip, the Ice Harvest Festival in the Poconos, and several camping trips in New Jersey. Additionally, Noah's mother testified that defendant was in charge of her son and that defendant always paid for her son whenever they were together. When Noah and defendant went to Washington, D.C., Noah's mother gave defendant a "written up consent" in case something happened so defendant was "more or less power-of-attorney."

Although Ethan's relationship with defendant was not as extensive as Noah's, Ethan testified he often spent the night at defendant's house and went camping with defendant several times. Ethan's mother also testified that when Ethan was with defendant,

24                                                          A-5025-13T2

defendant was in charge and she expected defendant to take care of Ethan.

Joey testified that defendant was a family friend whom he had known for most of his life. Joey explained that he went on trips and spent many weekends with defendant. Joey also testified that defendant bought him food, paid for hotel rooms and was generally in charge. Joey's mother told Joey to listen to defendant while they were together.

Defendant and Wyatt had an extensive relationship. Wyatt testified that shortly after meeting defendant, he began staying at defendant's house a few nights a week. He also took trips with defendant, including a trip to Florida for one week during which defendant paid for everything. Wyatt further testified that defendant took Wyatt and Joey to Pennsylvania for a trip that lasted more than one week. Defendant took Wyatt to an orthodontist appointment and to take a high school entrance examination. At one point, defendant even offered to have Wyatt live with him.

The facts in this case are distinguishable from the facts in Galloway because here defendant had a continuous relationship with his victims in which he was responsible for them for frequent and lengthy periods of time. See Galloway, supra, 133 N.J. at 661-62. As our Supreme Court said in Sumulikoski, the relationship does not need to be a formal one to fall under this statute.

<u>Sumulikoski</u>, <u>supra</u>, 221 <u>N.J.</u> at 107-08.  Defendant has not demonstrated plain error.

B.

To be guilty of first-degree aggravated sexual assault of a child under thirteen years old, such as Ethan and Noah, the State need not prove that the defendant had supervisory authority over the victim.  <u>N.J.S.A.</u> 2C:14-2(a).  When the victim is between the age of thirteen and sixteen years old, however, the defendant's supervisory position must be demonstrated to convict for first-degree sexual assault.  Defendant argues as a matter of law that counts twelve, thirty-two, thirty-three, and thirty-five should be dismissed because the State did not prove he had "supervisory or disciplinary power over [David, Wyatt and Joey] by virtue of [his] legal, professional, or occupational status" as required under <u>N.J.S.A.</u> 2C:14-2(a)(2)(b).  Similarly, defendant argues that count twenty-seven, charging third-degree aggravated criminal sexual contact and also requiring the element of a supervisory position should be dismissed.  <u>N.J.S.A.</u> 2C:14-3(a).  The State responds that defendant had supervisory and disciplinary power of these boys as an adult caregiver, and, in the case of David, as a scoutmaster.

The jury should consider many factors in determining whether a supervisory relationship existed.  <u>See</u> <u>State v. Buscham</u>, 360

26

N.J. Super. 346, 361-62 (App. Div. 2003). Not only is a legal, professional or occupational status required, but also the relationship between the adult defendant and the child victim must be one "inherently unequal as to vest disciplinary or supervisory power" in the adult. Id. at 362. In Buscham, the question was whether a gymnastics instructor could qualify as having supervisory power over the victim. Id. at 352-62. While we found that a gymnastic instructor might exercise supervisory power, we noted that the inquiry was fact-specific. We listed several case-specific questions for the jury to consider:

> whether there was a significant disparity in ages and/or maturity level between the two; the role that the athletic activity plays in the life of the alleged victim; the extent, if any, to which the coach has offered guidance and advice to the alleged victim on questions and issues outside the athletic arena; and the power or ability of the coach to affect future athletic participation or success.

> [Id. at 362.]

We noted the questions for the jury's consideration should be structured "with particular reference to the evidence presented during the course of the trial." Ibid. The judge included these considerations in his jury charge.

David, Joey and Wyatt testified extensively about their relationship with defendant. Defendant was significantly older

and more mature than all three boys and was often in charge of their physical wellbeing.

Defendant met David through his role as assistant scoutmaster at a Boy Scout meeting. David testified that he went to weekly meetings and monthly overnight camping trips where defendant was present "[n]inety-nine point 9 percent of the time." David testified that he saw defendant as a role model. Defendant ultimately parlayed their common interest in camping and the wilderness into a sexual relationship with David, where they spent a great deal of time together at their homes. Defendant's focus on David's physical growth and sexual maturity also contributed to his parent-like, supervisory role.

Besides camping with the Boy Scouts, David and defendant went camping together in New Jersey, Pennsylvania, and Delaware while David was still in high school. During these trips, defendant was the only adult and David testified he put his trust in defendant. Viewing the State's evidence in its most favorable light, the jury could have found beyond a reasonable doubt that defendant had the statutorily required supervisory power over David by virtue of their relationship and defendant's occupational status as David's assistant scoutmaster.

As detailed above, "the nature of the relationship" between defendant and Joey and Wyatt demonstrates a similar supervisory

28

power.  Defendant took them on trips and engaged in sleepovers while overseeing their wellbeing.  Buscham, supra, 360 N.J. Super. at 362.  However, having supervisory power is not enough; N.J.S.A. 2C:14-2(a)(2)(b) requires that the defendant have such power "by virtue of . . . legal, professional, or occupational status." (Emphasis added).  The plain meaning of this requirement is that defendant acquired his supervisory power through his status, which invested additional responsibility in defendant.  See State v. Rangel, 213 N.J. 500, 508-08 (2013) (stating that interpretation of legislative intent begins with an analysis of the statute's "ordinary meaning").

This standard can be contrasted with N.J.S.A. 2C:14-2(c)(3)(b), second-degree sexual assault, which states the actor must have "supervisory or disciplinary power of any nature or in any capacity over the victim," who is at least sixteen years old but less than eighteen years old.  (Emphasis added).  According to our Supreme Court "[w]ords make a difference."  Rangel, supra, 213 N.J. at 514.  "'[W]hen the Legislature includes limiting language in one part of a statute, but leaves it out of another,' a court should assume that it intended a different meaning."  Ibid. (quoting Ryan v. Renny, 203 N.J. 37, 58 (2010)).  Furthermore, "we must try to read the various parts of N.J.S.A. 2C:14-2 so that none are rendered meaningless."  Id. at 512.  The language of

N.J.S.A. 2C:14-2(a)(2)(b), which defines an element of first-degree aggravated sexual assault and third-degree aggravated sexual contact, is intended to identify those defendants who should be subjected to harsher penalties. Defendant, who met Wyatt through shared band activity, where defendant was not an instructor, and met Joey through Joey's family, does not meet this requirement with regard to his sexual assaults on Wyatt or Joey.

This is not to suggest that an offending party must be part of a formal activity in order to be subject to N.J.S.A. 2C:14-2(a)(2)(b). In Buscham, the court declined to restrict the "supervisory or disciplinary" relationship to leaders and participants in institutional activities. Buscham, supra, 360 N.J. Super. at 361-62. In this case, however, the only relationship the State alleges is one of "caregiver." Defendant was not a childcare provider.

Count twelve is therefore dismissed and count thirteen, charging the lesser-included crime of second-degree sexual assault on Wyatt, N.J.S.A. 2C:14-2(c)(4), should be resurrected. We remand for sentencing on count thirteen, and also remand on count twenty-seven, for sentencing on the lesser-included crime. Defendant was convicted of count twenty-seven, third-degree aggravated criminal sexual contact against Joey, when the jury checked the verdict sheet to answer that he was guilty of the lesser-included crime

of fourth-degree criminal sexual contact. The jury also affirmatively answered that he had the supervisory power over Joey necessary to convict him of third-degree aggravated criminal contact. That finding of supervisory power based on "legal, professional or occupational status" was not supported by the evidence, thus we remand for resentencing on the lesser crime of fourth-degree sexual contact.

V

In Point III, defendant argues as plain error that the judge erred by not charging the lesser-included offense of second-degree child endangerment, N.J.S.A. 2C:24-4(a). "No defendant should be convicted of a greater crime or acquitted merely because the jury was precluded from considering a lesser offense that is clearly indicated in the record." State v. Garron, 177 N.J. 147, 180 (2003), cert. denied, 540 U.S. 1160, 124 S. Ct. 1169, 157 L. Ed. 2d (2004).

The judge charged the jury:

> Now, you'll have back there with you when you begin your deliberations what we call a jury verdict sheet. It sets forth the counts of the indictment that you're to consider. It's not evidence; It's to assist you in recording your verdict, whatever it may be, and to report it back to the Court . . . You'll notice, however, that some of the counts, you'll see they're set forth with boldface type, have additional questions and that really just helps you in deciding what happened in each of the cases, so you'll read

31

the count in the indictment, for example, the endangering counts have the additional question. It sets forth the allegations and then you decide not guilty or guilty. If you find the defendant guilty, then you consider the additional question and that regards his supervisory power, whether you believe he had supervisory power, you answer it yes or no.

The trial judge did not specifically explain to the jury that answering the additional question in the negative meant convicting defendant of a lesser-included offense. However, the trial judge gave the jury the option of finding that defendant did not have a caretaking role over the children. If the jury answered the subsequent question "no," defendant would not have been convicted of the more serious charge. Thus, the jury had the option of finding defendant guilty of lesser-included crimes.

VI

In Point IV, defendant argues that counts nine, ten, fifteen, and sixteen should be dismissed because a detective failed to tell the grand jury about the first interview he had with Wyatt in which Wyatt told the detective he was thirteen or fourteen when he met defendant. Later Wyatt disclosed he was actually younger when he met defendant. Our Supreme Court has held that a prosecutor must disclose exculpatory evidence to a grand jury "only if the evidence satisfies two requirements: it must directly negate guilt and must also be clearly exculpatory." State v. Hogan, 144 N.J. 216, 237 (1996). Evidence undermining the

32                                                                    A-5025-13T2

credibility of a witness need not be presented. <u>Ibid.</u> Thus the State did not err in failing to mention Wyatt's initial conflicting statement.

## VII

In Point V, defendant also argues counts thirty-two, thirty-three and thirty-five of the indictment should be dismissed because the charge failed to inform the jury of the place where the assaults occurred. In fact, in the verdict sheets the incidents were alleged to have occurred in Absecon or Brigantine in Atlantic County.

## VIII

With regard to sentencing, the findings of fact concerning aggravating and mitigating factors were based on competent and credible evidence in the record, the court correctly applied the sentencing guidelines enunciated in the Code of Criminal Justice, and the court did not abuse its discretion in imposing the aggregate sentence. It is not manifestly excessive or unduly punitive and does not constitute an abuse of discretion. <u>State v. Cassady</u>, 198 <u>N.J.</u> 165, 180-81 (2009); <u>State v. Roth</u>, 95 <u>N.J.</u> 334, 364-65 (1984). We are also satisfied that the court correctly applied the guidelines for imposing consecutive terms. <u>State v. Yarbough</u>, 100 <u>N.J.</u> 627, 643-44 (1985), <u>cert. denied</u>, 475 <u>U.S.</u>

1014, 106 <u>S. Ct.</u> 1193, 89 <u>L. Ed.</u> 2d 308 (1986), <u>amended by</u> <u>N.J.S.A.</u> 2C:44-5(a) (<u>L.</u> 1993, <u>c.</u> 223).

Defendant was convicted in counts thirty-two, thirty-three and thirty-five, of first-degree aggravated sexual assault, <u>N.J.S.A.</u> 2C:14-2(a), that occurred between April 1, 1997 and September 17, 1999. He was sentenced to a ten-year NERA sentence on each count. The version of NERA in effect at the time of the crimes must be applied in sentencing. <u>State v. Parolin</u>, 171 <u>N.J.</u> 223, 233 (2002). At the time of these crimes, the statute required the jury to determine whether or not the crimes were "violent" for the purpose of imposing NERA. <u>State v. Mosley</u>, 335 <u>N.J. Super.</u> 144, 159 n.4 (2000), <u>certif. denied</u>, 167 <u>N.J.</u> 633 (2001). Because the jury was not asked that question, the State concedes we must remand for re-sentencing without the imposition of NERA on those three counts.

The remaining issues raised by defendant in his counsel's brief and his pro se brief are without sufficient merit to require discussion in this opinion. <u>R.</u> 2:11-3(e)(2). We add only that the State's comments in summation that defendant's argument at one point was "ridiculous" and that the jury should not let the defense "hijack" the case, came nowhere close to "misconduct [that] was 'clearly and unmistakably improper, and . . . substantially prejudiced defendant's fundamental right to have a jury fairly

evaluate the merits of his defense.'" State v. Koskovich, 168 N.J. 448, 488 (2001) (quoting Timmendequas, supra, 161 N.J. at 575).

We also note that some counts in the indictment overlap, charging generally the same conduct during overlapping timeframes against the same victim. After discussion, the judge cleared up this problem by distinguishing the behavior charged, or the location, or the time frames in the verdict sheet to the apparent satisfaction of both counsel. Counts seventeen and twenty-two overlap, however, and the verdict sheet for those two counts seemingly fails to distinguish sufficiently between them. The verdict sheet for count seventeen reads:

> The Defendant, Brian E. Killion, on and between October 8, 2004 through October 7, 2006, in the City of Fairview, County of Camden, and within jurisdiction of this Court, did engage in sexual conduct which would impair and debauch the morals of [Wyatt].

Count twenty-two reads:

> The Defendant, Brian E. Killion, on and between October 8, 2004 through October 7, 2008, in the City Absecon and the City of Fairview, Counties of Atlantic and Camden, and within jurisdiction of this Court, did engage in sexual conduct which would impair and debauch the morals of [Wyatt].

> [(Emphasis added).]

The additional language in the verdict sheet for count twenty-two, unfortunately, does not solve the overlap between the charges

because if the jury found that defendant committed the sexual conduct in 2005 in Fairview, it might have convicted defendant of both counts seventeen and twenty-two for the same conduct. Although defendant does not raise this issue on appeal, in the interest of justice, we direct the court on remand to entertain argument as to whether one of these counts must be dismissed to ensure defendant was not convicted twice for the same crime. R. 2:10-2.

We dismiss the conviction on count twelve for aggravated sexual assault, N.J.S.A. 2C:14-2(a), and remand for resentencing on count thirteen, second-degree sexual assault under N.J.S.A. 2C:14-2(c)(4), which had been merged into the now-dismissed aggravated sexual assault conviction. We also amend defendant's conviction on count twenty-seven to a conviction of the lesser crime of fourth-degree criminal sexual contact and remand for resentencing on this lesser crime. The NERA provision of the sentences on counts thirty-two, thirty-three and thirty-five should be removed, and we remand for that purpose also.

Affirmed in part and reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION